IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| TINA R. WEBB, | § | |
|      PLAINTIFF, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:08-CV-747-Y |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
|      DEFENDANT. | § | |

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.  STATEMENT OF THE CASE

Plaintiff Tina R. Webb filed this action pursuant to Sections 405(g) and 1383(c)(3) of

Title 42 of the United States Code for judicial review of a final decision of the Commissioner of

Social Security denying her claims for disability insurance benefits under Title II and

supplemental security income ("SSI") benefits under Title XVI of the Social Security Act

("SSA").  In March 2006, Webb applied for disability insurance and SSI benefits, alleging that

she became disabled on November 3, 2005.  (*See* Tr. 15, 46-49, 56, 60, 101.)  She later amended

her alleged onset of disability date to December 6, 2005.  (Tr. 15, 101, 381-82.)  Webb last met

the insured status requirements on June 30, 2007.  (Tr. 16, 54.)  Her applications were denied

1

initially and on reconsideration.  (Tr. 15.)  The ALJ held a hearing on December 12, 2007 and

issued a decision on May 28, 2008 that Webb was not disabled because she was capable of

performing her past relevant work as a city bus driver.  (Tr. 12-23.)  The Appeals Council denied

Webb's request for review, leaving the ALJ's decision to stand as the final decision of the

Commissioner.  (*See* Tr. 5-8; 11.)

B.      STANDARD OF REVIEW

        Disability insurance is governed by Title II, 42 U.S.C. § 401 *et seq.*, and SSI benefits are

governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA.  In addition, numerous regulatory

provisions govern disability insurance and SSI benefits.  *See* 20 C.F.R. Pt. 404 (disability

insurance); 20 C.F.R. Pt. 416 (SSI).  Although technically governed by different statutes and

regulations, "[t]he law and regulations governing the determination of disability are the same for

both disability insurance benefits and SSI."  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.

1994).

        The SSA defines a disability as a medically determinable physical or mental impairment

lasting at least twelve months that prevents the claimant from engaging in substantial gainful

activity.  42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir.

1999).  To determine whether a claimant is disabled, and thus entitled to disability benefits, a

five-step analysis is employed.  20 C.F.R. §§ 404.1520, 416.920 (2009).  First, the claimant must

not be presently working at any substantial gainful activity. Substantial gainful activity is defined

as work activity involving the use of significant physical or mental abilities for pay or profit.  20

C.F.R. §§ 404.1527, 416.972.  Second, the claimant must have an impairment or combination of

impairments that is severe.  20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d

2

1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*,

3

837 F.2d at 1383.

C.     ISSUES

    1.     Whether the ALJ erred in failing to adequately consider all of Webb's vocationally significant medical impairments when determining Webb's residual functional capacity ("RFC").

    2.     Whether the ALJ erred by not considering the opinion evidence from the state agency medical consultants.

    3.     Whether the ALJ erred in failing to obtain vocational testimony regarding whether Webb's moderate limitations in concentration, persistence, and pace would interfere with her ability to perform her past relevant work as a bus driver.

D.     ADMINISTRATIVE RECORD

    1.   Relevant Treatment History

Webb was treated for depression on July 5, 2005 at the psychiatric department of the John Peter Smith Health Network ("JPSHN").  (Tr. 123, 130-32.)  In September 2005, Webb had a urine glucose level of 500.  (Tr. 167, 320.)  On December 6, 2005, Webb was admitted to the hospital following a suicide attempt.  (Tr. 110, 322; *see* 111-18, 323-45, 387.)  Following a verbal argument with her husband, Webb had taken Tylenol, aspirin, Coumadin, and her husband's pills and drank alcohol.  (*Id.*)  Upon her discharge on December 8, 2005, Webb was diagnosed with post suicide attempt by polysubstance overdose, hypertension, and a possible urinary tract infection, and prescribed medication.  (Tr. 110, 322; *see* Tr. 111-18.)

On December 19, 2005 and January 6, 2006, Webb was seen at the Behavioral Health Clinic at Tarrant County Hospital District, JPSHN, for medication monitoring appointments.  (Tr. 119-22; 317-18).  She complained, *inter alia*, that she was having trouble sleeping, had an increased appetite, and was having suicidal thoughts.  (Tr. 119-22.)  She was diagnosed with

major depressive disorder, recurrent and moderate, and prescribed Zoloft and Trazodone.  (*Id.*)

From January through July 2006, Webb was treated at the Tarrant County Hospital District Outpatient Clinic for a variety of impairments, including hypertension, insomnia, obesity, depression and uncontrolled diabetes mellitus ("diabetes").  (Tr. 141-145.)  Webb was also treated at the Mental Health and Mental Retardation ("MHMR") of Tarrant County from March 2006 through November 2007.  (Tr. 204-60, 347-65.)  In a Psychiatric Evaluation dated March 9, 2006, Karen Price, M.D., diagnosed Webb with major depressive disorder, recurrent with severe psychotic features, high blood pressure, and headaches.  He also evaluated whether to rule out anxiolytic[1] abuse and post-traumatic stress disorder [("PTSD")]" and rated Webb's GAF[2] at 40.[3]  (Tr. 250; *see* Tr. 250-55.)  Webb complained that she suffered from nightmares, headaches, dizziness, blurred vision, and nausea.  (252-53.)  Price noted that Webb weighed 224.5 pounds and appeared agitated at times while discussing situations and that her depression and PTSD were undertreated.  (Tr. 251, 253.)

On March 23, 2006, Webb was seen at MHMR because she had difficulty falling asleep for two days before being seen.  (Tr. 248.)  Progress notes indicated that she weighed 224 pounds and that her intellect was "an issue."  (*Id.*)  Webb was treated on March 28, 2006 by Price, who noted that Webb seemed to have limited intelligence.  (Tr. 246.)  On August 24, 2006, Webb's blood pressure was 140/80, and she reported having trouble sleeping and feeling more irritable.

---

[1] Anxiolytic is an antianxiety agent.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 113 (31st ed. 2007).

[2] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) (DSM-IV).

[3] A GAF score of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  DSM-IV at 34.

(Tr. 240.)  She weighed 238 pounds, had a body mass index of 40.7, and was counseled on the importance of managing excess weight through diet and exercise.  (Tr. 242.)

In a Daily Activity Questionnaire ("DAQ") dated April 16, 2006, Webb stated that she had mental or emotional problems that limited what she was able to do.  She indicated that she washed clothes and did house work during the day, had problems remembering things, was not always able to get along with family and friends, and got mad at times.  (Tr. 65-69.)

Webb was referred by a disability examiner to G.A. Jason Simpson, Psy.D., for a psychological evaluation, which was conducted on June 29, 2006.  (Tr. 124-29.)  At the evaluation, Webb stated that her depression began in 2001 after the death of her cousin, that she had an increased appetite, decreased ability to sleep, decreased interest in relationships with others, and cried without stimulus.  (Tr. 124.)  She also stated that was able to take care for herself and generally able to complete important tasks.  (Tr. 124.)  Simpson noted that Webb's mood was depressed and her affect was blunted.  Simpson also indicated that Webb had below average intelligence and noted, among other things, that she had difficulty in performing mathematical calculations and that her abstract and concrete thinking were poor.  (Tr. 126-27.)  Simpson diagnosed Webb with major depressive disorder, single episode, severe without psychotic features and (provisional) borderline intellectual functioning and gave her a GAF score of 58.[4]  (Tr. 128-29.)  He stated that Webb's prognosis was fair to good and was dependent upon her medication being managed by a psychiatrist and concurrent individual psychotherapy by a licensed clinical social worker or psychologist.  (Tr. 129.)  He also opined that Webb was not

---

[4] A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

able to manage benefit payments on her own behalf and did not have a basic understanding of the meaning of filing for benefits.  (Tr. 129.)

On June 30, 2006, Webb was examined by Wendell Jones, M.D., at the request of the disability examiner for a medical evaluation regarding her hypertension, diabetes, and headaches. (Tr. 133-40.)  Jones noted that Webb weighed 235 pounds and was 64.5 inches tall.  (Tr. 134.) Jones noted that Webb's hypertension was recently diagnosed and was under control and that there was no appearance that her diabetes had caused end organ damage.  (Tr. 134.)  Jones also indicated that the only associated symptom with Webb's headaches was dizziness, which could be related to her hypertension, and that Webb could benefit from further medication.  (Tr. 135.) Jones further noted, "Gait and station, toe, heel, and tandem walking, getting on and off the table, moving around the room, and fine and dexterous finger control is intact."  (Tr. 134.)

In a Mental Residual Functional Capacity Assessment dated July 20, 2006, Jim Cox, Ph.D., opined that Webb was moderately limited in her ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting.  (Tr. 145-48.)  He also opined that Webb was markedly limited in her ability to understand and remember detailed instructions and carry out detailed instructions.  (*Id.*)

7

In a Psychiatric Review Technique Form ("PRTF"), also dated July 20, 2006, Cox opined that Webb suffered from an Affective Disorder under Section 12.04 of the Listing.  (Tr. 149-62.) He indicated that she suffered from major depressive disorder, single episode, without psychotic features and that such impairment did not precisely satisfy the diagnostic criteria of Section 12.04 of the Listing.  (Tr. 152.)  He noted that Webb was mildly limited in her activities of daily living, and had moderate difficulties in maintaining social functioning, concentration, persistence, or pace.  (Tr. 159.)

James Wright, M.D., opined in a Case Assessment Form ("CAF") dated July 21, 2006 that Webb had the non-severe impairments of hypertension and diabetes and that there was "no evidence of EOD" from either the hypertension or the diabetes.  (Tr. 163.)  On August 14, 2006, Webb sought medical treatment for high blood sugar and some blurring of vision.  (Tr. 310-16.) The examining doctor noted that Webb had poorly controlled type II diabetes.  (Tr. 311.)

On October 5, 2006, while being treated at MHMR, Webb indicated that she was "okay", feeling tired, and taking her medicine as prescribed.  (Tr. 238.)  On November 2, 2006, Webb stated that she was fine and that her mood has improved with the increase in Lexapro.  (Tr. 236.) Her GAF rating was increased to 42.[5]  (Tr. 237.)

In a DAQ dated November 14, 2006 regarding her physical impairments, Webb stated that her physical problems prevented her from working and that she liked to be by herself.  (Tr. 78; *see* Tr. 78-80.)  She claimed that her physical problems limited all of her daily activities and that she sat on her bed until the afternoon and cooked when she felt like it during the day.  (Tr.

---

[5] A GAF score of 41 to 50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV at 34.

79.)  In a DAQ also dated November 14, 2006 regarding her mental impairments, Webb stated that her mental and emotional problems limited what she was able to do because she did not like noise and could not be around people for very long.  (Tr. 81; *see* Tr. 81-85.)  She claimed that during the day she sometimes watched the television and that she had difficulties brushing her teeth.  (Tr. 82.)  She also indicated that her daughter helped her pay the bills, she did not get along with others, and she was forgetful.  (Tr. 83.)[6]

In a Disability Determination and Transmittal ("DDT") Form dated December 8, 2006, Mora Dolan, M.D., diagnosed Webb with affective mood disorders and diabetes mellitus and opined that Webb was not disabled.  (Tr. 32.)[7]  Furthermore, in a CAF also dated December 8, 2006, Dolan opined that Webb had the non-severe impairments of hypertension and diabetes and that there was "no evidence of EOD" as a result of the impairments.  (Tr. 173.)

In a PRTF dated December 8, 2006, Lee Wallace, Ph.D., stated that Webb suffered from major depressive disorder, which was not severe.  (Tr. 174- 87.)  Wallace further indicated that this impairment fell under Section 12.04 of the Listing but that it did not precisely satisfy the diagnostic criteria of such Listing.  (Tr. 177.)  Wallace opined that Webb's impairment mildly restricted her activities of daily living and her ability to maintain social functioning, concentration, persistence, and pace.  (Tr. 184.)

Webb complained on January 29, 2007 that she was irritated, agitated, having trouble sleeping, depressed, and not doing any better.  (Tr. 222.)  She stated that she sometimes forgot to

---

[6] In three undated Disability Report Forms, one Form SSA 33-68 and two Forms SSA-3441, Webb claimed that her manic depression and high blood pressure limited her ability to work.  (Tr. 59; *see* Tr. 59-64.)  She also stated that she had severe headaches, drowsiness, a bad memory, and stayed in bed all day.  (*Id.*)  She further claimed that she had trouble with her eyes and was depressed.  (Tr. 88-93; *see* Tr. 94-99.)

[7] Dolan made the same diagnosis and opinion in a DDT Form dated March 9, 2007.  (Tr. 31.)

take her pills, and it was noted that she was having hallucinations.  (*Id.*)  Her blood pressure was

133/78, and she was diagnosed with hypertension, diabetes, and a GAF rating of 42.  (Tr. 222-

23.)  Progress notes dated February 26, 2007 from MHMR indicate that Webb was very difficult

to assess and that she seemed to have difficulty understanding questions.  (Tr. 220.)  Webb

continued to complain that she was having difficulty sleeping and continued to hear one voice.

She was prescribed a new medication, Seroquel.  (Tr. 200-21.)  On May 8, 2007, Webb stated

that she was anxious, depressed at times, and was having difficulty sleeping.  (Tr. 206.)  Her

blood pressure was 135/76, and the progress notes from MHMR indicated that Webb could not

remember taking Seroquel even after samples of the medication were shown to her.  (Tr. 206.)

In a CAF dated March 9, 2007, Dolan again opined that Webb had the non-severe

impairments of hypertension and diabetes and that the "alleged limitations caused by [Webb's]

symptoms [were] partially supported by the medical and other evidence."  (Tr. 188.)  In a PRTF

also dated March 9, 2007, Wallace again opined that Webb suffered from a major depressive

disorder, which was not severe and did not precisely satisfy the diagnostic criteria of Section

12.04 of the Listing.  (Tr. 189, 192; *see* Tr. 189-202.)  He again opined that Webb's impairment

mildly restricted her activities of daily living and her ability to maintain social functioning,

concentration, persistence, and pace.  (Tr. 199.)

On June 19, 2007, progress notes from MHMR indicate that Webb's blood pressure was

134/77, she had gained 23 pounds in fourteen months, and she did not want to follow "DM

protocol."  (*Id.*)  Webb stated that she felt less anxious and was sleeping better.  She was given

literature on nutrition and encouraged to get a referral to a nutritionist.  (*Id.*)  On August 1, 2007,

Webb reported to Price that she had decreased energy and progress notes show that Webb was

slow in responding and comprehending things.  (Tr. 357.)  Price noted that Webb had very simple and limited intelligence and gave her a GAF rating of 40.  (Tr. 358.)  In September 2007, Webb's GAF was rated at 50, she weighed 242 pounds, and she had an increased glucose level. (Tr. 348-49; *see* 347-52.)  She reported that she was doing great, sleeping well and feeling much better.  (Tr. 351.)

From January 2007 through November 2007, Webb was also treated at the Community Health Services Outpatient clinic at the Tarrant County Hospital District for a variety of ailments, including high blood pressure, headaches, bilateral knee pain with popping, and diabetes.  (Tr. 265-76, 367-68.)  In January 2007, Webb had a urine glucose level in excess of 1000 (Tr. 283), and she was diagnosed with diabetes, hypertension, headaches, and bilateral knee arthralgias due to obesity (Tr. 276).  In November 2007, one of the physicians noted that she had uncontrolled hypertension, currently at 151/82.   (Tr. 368.)   Webb was also treated at the Ophthalmology Clinic of the Tarrant County Hospital District from March 2007 through June 2007 for optic disk edema.  (Tr. 289-98, 308-09.)

2.  Administrative Hearing

Webb was born on July 24, 1967 (Tr. 46, 56, 383), dropped out of school after the 10th grade (Tr. 63, 383), and later obtained her GED (Tr. 383).  She previously worked as a janitor, school bus driver, city bus driver, packer, and security guard.  (Tr. 60, 70, 384-86.)  At the hearing, she testified that she was still feeling depressed, only hearing voices once or twice a year, and still having daily headaches due to the swelling in the back of her eyes.  (Tr. 388-89.) She further testified that she no longer sang in the church choir or was able to care for her grandson because she felt depressed and mentally weak.  (Tr. 390-91.)  She stated that her

diabetes affected her life on a daily basis and that her knees hurt a lot, affecting her ability to stand or walk. (Tr. 392.) She testified that although she had never had to take insulin for her diabetes, she had been hospitalized for conditions related to her diabetes. (Tr. 395.)

Shelly Eike, a vocational expert, also testified at the hearing. (Tr. 398-400.) She stated that Webb's past work as a city bus driver was medium, semiskilled work with a specific vocational preparation ("SVP") of four and a reasoning development level ("RDL") of 3. (Tr. 399.) She stated that such job would require superficial contact with the public. She further testified that if the claimant missed work a couple of times a month because of crying spells or depression then the claimant would not be able to maintain such a job or any job. (Tr. 399-400.)

3. ALJ Decision

The ALJ, in his May 28, 2008 decision, found that Webb had not engaged in any substantial gainful activity at any time relevant to his decision. (Tr. 16.) He further found that Webb suffered from obesity, headaches, hypertension, non-insulin-dependent diabetes, bilateral optic disc edema, knee arthritis, major depressive disorder without psychosis, and a history of anxiolytic abuse. (*Id.*) The ALJ presumed that Webb had a severe combination of impairments but found that such impairments or combinations of impairments did not meet or equal the criteria of any of the impairments in the Listing. (*Id.*) As to Webb's diabetes, the ALJ stated that although the record established that Webb had poorly controlled non-insulin-dependent diabetes, Webb "has not been compliant with diabetic medication and a proper diabetic diet." (Tr. 17.) He further stated:

> In reaching my findings and in evaluating the relevant factors I am to consider, I recognize Ms. Webb's impairments may result in some level of pain and in some functional loss, but I note even moderate levels of pain and

functional loss are not, in and of themselves, incompatible with the ability to perform the exertional and nonexertional requirements of work-related activities on a consistent, sustained basis.   In this case, neither the objective medical evidence, the allegations of Ms. Webb, nor the other evidence establishes the claimant is so limited as to be found disabled.

I note there is no significant evidence Ms. Webb's obesity is not amenable to control.   Her hypertension has been well controlled over all.   Although her diabetes has not been well controlled, Ms. Webb has not been compliant with medication or proper diet.   Compliance with diet in particular would likely also help to resolve Ms. Webb's obesity and would likely reduce her blood sugar levels.   Despite hypertension and diabetes, Ms. Webb has no evidence of end organ damage.   Despite optic disc edema, her visual acuity is very good. Although Ms. Webb has knee pain secondary to arthritis, that too could be alleviated with weight loss.   I also note Ms. Webb testified as to significant symptoms secondary to headaches.   However, the medical records establish she has repeatedly denied headaches when examined.

Given the objective medical evidence, I find the foregoing impairments, whether considered individually or in combination, have no more than a minimal effect on Ms. Webb's ability to perform basic work-related activities.   I note in particular that Ms. Webb has an excellent physical examination when Dr. Jones examined her in June 2006.   Therefore, I find the medical evidence supports a finding that the claimant does not have any limitations in her ability to perform the exertional requirements work-related activities on a consistent, sustained basis.

However, Ms. Webb's ability to perform a full range of work is limited by her mental impairments.   I note Ms. Webb's pattern of noncompliance with medication also is applicable to the psychotropic medication.   MHMR records establish the claimant's symptoms waxed and waned.   Nevertheless, she did improve. . . .

. . . In this case, I have determined Ms. Webb's mental impairments have moderately restricted her activities of daily living (given the MHMR reports that she sometimes remained in bed all day), have created moderate difficulties in maintaining social functioning (given Ms. Webb's history of a physical altercation with a coworker and given reports that she does not socialize or get along well with others), have resulted in moderate deficiencies of concentration, persistence, or pace (given the MHMR reports and Dr. Simpson's examination), and have resulted in one episode of decompensation in December 2005 that was not of extended duration. . . .

. . . Ms. Webb retains the ability to obtain, perform, and maintain the following residual functional capacity: she has no limitations in lifting and carrying; she can sit, stand, and walk (individually or in combination) throughout an eight-hour workday; and she can otherwise perform the full range of work, with the following exceptions.  She must perform jobs with a reasoning development level of one, two, or three . . ., and she must have no more than superficial contact with the public.

(Tr. 21-22.)   Based on this RFC assessment, Webb found that Webb retained the ability to perform her past relevant work as a city bus driver, and, consequently, was not disabled.  (Tr. 22-23.)

E.      DISCUSSION

1.   Residual Functional Capacity

Webb argues that the ALJ erred in failing to adequately consider all of her vocationally significant medical impairments when determining her RFC.  (Pl.'s Br. at 9-13; Pl's Reply Br. at 1-2.)  Specifically, Webb notes that at Step Two of the disability evaluation process the ALJ found that Webb had a severe combination of impairments.  (Pl.'s Br. at 9.)  However, Webb claims that this finding is inconsistent with the ALJ's finding at Step Four that Webb's RFC was only limited as a result of her depression.  Webb argues that the ALJ failed to consider the functional significance of all of Webb's other impairments, including specifically her knee arthritis, diabetes and obesity, on her ability to engage in work-related activities at Step Four. (*Id.*)

Webb further argues that the ALJ acknowledges that she has poorly controlled diabetes and is obese but then improperly speculates, without medical support, that she has not been compliant with diabetic medication and a proper diet and that proper compliance would help resolve her obesity, diabetes, and knee pain.  (Pl.'s Br. at 11.)  Webb states that "it appears that

14

the ALJ simply dismissed the Plaintiff's diabetes and obesity on the basis of some fundamental weakness in her character and refused to evaluate the functional effect of these impairments upon her ability to engage in work-related activities." (Pl.'s Br. at 12.)

RFC is what an individual can still do despite her limitations.[8]  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).  It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis.  *Id*.  *See Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule.  *Id*.  RFC is not the least an individual can do, but the most.  SSR 96-8p at *2.  The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered and is based upon all of the relevant evidence in the case record.  *Id*. at *3-5.  The ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence.  *Id*. at *7.  In making an RFC assessment, the ALJ must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, and must consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe.  *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p at *5.  The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security rulings also caution that presumptions, speculation, and supposition do not

---

[8] The Commissioner's analysis at Steps Four and Five of the disability evaluation process is based on the assessment of the claimant's RFC.  *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005).  The Commissioner assesses the RFC before proceeding from Step Three to Step Four.  *Id*.

constitute evidence.  *See, e.g.*, SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), *superseded by* SSR 91-7c, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (only to the extent the SSR discusses the former procedures used to determine disability in children).

As to obesity, the Social Security rulings recognize that obesity, though not a listed impairment, can reduce an individual's occupational base for work activity in combination with other ailments.  *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(Q) (2008); SSR 02-1p, 2000 WL 628049, at *5-7 (S.S.A. Sept. 12, 2002); *see generally* SSR 96-8p at *1.  A claimant's obesity must be considered at all steps of the sequential evaluation process.  SSR 02-1p at *3.

In this case, the ALJ determined that Webb had a "severe" combination of impairments at Step Two, including obesity, headaches, hypertension, non-insulin-dependent diabetes mellitus, bilateral optic disc edema, knee arthritis, major depressive disorder without psychosis, and a history of anxiolytic abuse.  (Tr. 16-17.)  The ALJ further stated that he had "considered Webb's obesity, as required by Social Security Ruling 02-1p." (Tr. 16)  The ALJ reviewed Webb's medical records, noting the following: (1) she had gained a significant amount of weight, (2) she had not been compliant with diabetic medication and a proper diabetic diet, (3) she, at times, had elevated glucose levels, and (4) she experienced pain and popping in her knees.  (Tr. 17.)  The ALJ also reviewed Webb's testimony regarding such impairments.  (Tr. 20-21.)  In determining Webb's RFC at Step Four of the disability process, the ALJ noted that despite her diabetes, Webb had no evidence of end organ damage and there was no significant evidence that her obesity and diabetes could not be controlled, especially by compliance with a proper diet.  (Tr. 21.)  The ALJ found, based on the objective medical evidence, that Webb's impairments (with the exception of her mental impairments) had no more than a minimal effect on her ability to

perform work-related activities.  (*Id.*)  Ultimately, the ALJ determined that neither the objective medical evidence nor the allegations of Webb, or other evidence in the record established that Webb's impairments caused her to be disabled.  (Tr. 21.)

As to Webb's argument that it was, in essence, inconsistent for the ALJ to find at Step Two that Webb had severe impairments and then find at Step Four that the majority of her severe impairments did not affect her RFC, the court notes that "having a severe impairment is not a sufficient condition for receiving benefits under the Secretary's regulations," but "means only that claimant has passed the second step of the inquiry mandated by the regulations."  *Shipley v. Sec. Of Health and Human Servs.*, 812 F.2d 934, 935 (5th Cir. 1985).  *See Ledezma v. Apfel*, 161 F.3d 8 (5th Cir. 1998).  In other words, the consideration of whether a claimant's impairments are severe at Step Two is a different inquiry than an ALJ's assessment of the claimant's RFC. *See Boyd v. Apfel*, 239 F.3d 698, 706 (5th Cir. 2001) ("The ALJ's finding that Boyd had a 'combination of impairments that is severe' did not foreclose a finding that Boyd had a residual functional capacity to perform a range of light work, and is not necessarily inconsistent with that finding."); *Gutierrez v. Barnhart*, 2005 WL 1994289, at *9 (5th Cir. Aug. 19, 2005) ("A claimant is not entitled to social security disability benefits merely upon a showing that she has a severe disability.  Rather, the disability must make it so the claimant cannot work to entitle the claimant to disability benefits.").

Even assuming that the ALJ engaged in improper speculation regarding Webb's compliance with diabetic medication and a proper diet, Webb has not demonstrated that any alleged speculation on the part of the ALJ was significant enough to alter the ALJ's overall determination regarding her RFC.  On at least one occasion a doctor noted that Webb was not

following the protocol for diabetes (Tr. 204) and on at least two occasions, Webb was encouraged by a doctor to seek nutrition counseling.  (Tr. 204, 240.)  Furthermore, Webb has failed to identify any evidence that indicates that any such impairments limited her ability to perform basic work activities and there is no objective evidence that any decreased functioning was attributable to such impairments.  *See, e.g., Campos v. Astrue*, No. 5:08-CV-115-C, 2009 WL 1586194, at *3-4 (N.D. Tex. June 8, 2009); *Crossley v. Astrue*, No. 3:07-CV-0834-M, 2008 WL 5136961, at *5 (N.D. Tex. Dec. 5, 2008) ("Obesity is not a per se disabling impairment and Plaintiff has offered no medical evidence that her obesity actually results in these limitations or any further limitations beyond the sedentary work level found by the ALJ.")  In addition, there is substantial evidence supporting the ALJ's RFC determination, including Jones's evaluation in June 2006 indicating that there was no evidence that her diabetes had caused end organ damage, and that she was, in essence, able to move around the room and get on and off the table without problems.  (Tr. 134-35.)

Based on the foregoing, it is clear that the ALJ did consider Webb's obesity, diabetes, and knee pain in determining Webb's RFC and substantial evidence supports the ALJ's determination.  Because substantial evidence supports the ALJ's assessment of Webb's residual functional capacity and the assessment has not been shown to be a product of legal error, remand is not required.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (stating that the court will not vacate a judgment unless the substantial rights of a party have been affected).

2.  State Agency Medical Consultant ("SAMC") Opinions

Webb also argues that the ALJ erred by not considering the opinion evidence from the SAMCs as required by SSR 96-6p.  (Pl.'s Br. at 13-16.)  First, Webb argues that the ALJ never

considered the limitations reported by the state agency physicians in violation of SSR 96-6p. (Pl.'s Br. at 13-14; Pl's Reply at 2-4.)  Webb claims that Cox, one of the SAMCs, found in July 20, 2006 that Webb was *markedly* limited in her ability to understand, remember, and carry out detailed instructions and was limited to no more than simple instructions and simple decisions. (Pl.'s Br. at 13-14; Pl's Reply at 3; *see* Tr. 145-47.)  Webb claims that the ALJ erred because he never considered these limitations and, instead, found that Webb was capable of performing jobs with a RDL of one, two, or three, as defined in the Dictionary of Occupational Titles ("DOT"). (Pl.'s Br. at 14.)  Webb argues that, according to the definitions in the DOT, jobs at a RDL of three involve much more than simple instructions and simple decisions as they require the ability to "[a]pply commonsense understanding to carry out instructions furnished in written oral, or diagrammatic form[ and d]eal with problems involving several concrete variables in or from standardized situations."  (Pl.'s Br. at 14; *see* Dictionary of Occupational Titles, App. C (Rev. 4th ed. 1991).)[9]  Webb also argues that the ALJ, although noting the various GAF scores that had been given to Webb, "did not point to any other evidence in the record which would suggest that Webb has a higher level of functioning than was assessed by the treatment sources and as noted by the state agency physician."  (Pl's Br. at 15-16.)

Findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence (from non-examining sources) at both the administrative hearing and Appeals Council levels of

---

[9] RDL 1 requires the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions[ and d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job."  (Pl.'s Br. at 14; *see* DOT, App. C (Rev. 4th ed. 1991).)  RDL 2 requires the ability to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions[ and d]eal with problems involving a few concrete variables in or from standardized situations."  (*Id.*)

administrative review.  20 C.F.R. §§ 404.1527(f), 416.927(f); SSR 96-6p, 1996 WL 374180, at *2-4 (S.S.A. July 2, 1996).  Pursuant to SSR 96-6p, the ALJ and the Appeals Council are not bound by the state agency physicians' opinions, but may not ignore them and must explain the weight given to these opinions in their decisions.  SSR 96-6p, 1996 WL 374180, at *2.

The ALJ, in his opinion, reviewed Webb's medical records regarding her cognitive deficit, including the following: (1) MHMR records from March 2006 through June 2007 showing Webb had an estimated GAF that ranged from 40 to 42 and seemed to have difficulty understanding questions (Tr. 18-19) and (2) June 2006 examination by Simpson in which he indicated that Webb was below average in intelligence, had difficulty interpreting proverbs and performing similarities and differences, and did not understand how to perform serial seven and serial three mathematical calculations even though Simpson explained the process in four different ways (Tr. 19).  Citing to the MHMR reports that Webb sometimes remained in bed all day, her history of a physical altercation with a coworker and reports that she did not socialize or get along well with others and Simpson's examination, the ALJ opined that Webb's mental impairments moderately restricted her activities of daily living, created moderate difficulties in maintaining social functioning, and resulted in moderate deficiencies of concentration, persistence, or pace.  (Tr. 21.)  Based upon these limitations, the ALJ determined that Webb retained the ability to perform the full range of work except that she must perform jobs with a RDL of one, two, or three, and she must have no more than superficial contact with the public. (Tr. 22.)

In this case, the ALJ did acknowledge his obligation under SSR 96-6p when he stated that he must "consider the opinions of the State agency medical consultants who evaluated this

issue at the initial and reconsideration levels of the administration review process, pursuant to 20 C.F.R. §§ 404.1527 and 416.927, and Social Security Ruling 96-6p." (Tr. 16.)  In addition, the ALJ's conclusions regarding Webb's RFC assessment seem to take into account some of the findings of the SAMCs, specifically the SAMCs findings that Webb's mental impairments caused her moderate limitations in her activities of daily living, in maintaining social functioning, and created moderate deficiencies of concentration, persistence, or pace.  (Tr. 16, *see, e.g.,* Tr. 159.)  Although the ALJ erred by not referring specifically to Cox's July 20, 2006 opinion or any of the other SAMC opinions and specifying the weight he assigned to each such opinion, such error was harmless as there is substantial evidence supporting the ALJ's determination that Webb's mental impairments led to an RFC assessment that Webb must perform jobs with a RDL of one, two, or three and have no more than superficial contact with the public.  *See, e.g., Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *Mays*, 837 F.2d at 1364 ("Procedural perfection in administrative proceedings is not required.  This court will not vacate a judgment unless the substantial rights of a party have been affected.") (internal citations omitted); *Turney v. Astrue*, No. 4:08-CV-189-Y, 2009 WL 980323, at *5 (N.D. Tex. Apr. 9, 2009) ("The ALJ should have addressed the findings of the state agency medical consultants, but his failure to do so was harmless.");  *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 515-17  (S.D. Tex. 2003) (holding, in part, that ALJ's failure to expressly consider findings of one SAMC was harmless as there was substantial evidence in the record supporting the ALJ's decision).  The ALJ's determination is consistent with the MHMR treatment records, the opinion of Simpson, and the SAMC opinions that were not explicitly discussed.

Furthermore, although there is substantial evidence in the record supporting the ALJ'S

RFC determination, the court notes that Cox's opinion itself does not explicitly contradict the ALJ's findings. Cox found that Webb was markedly limited in her ability to understand, remember, and carry out detailed instructions and was limited to no more than simple instructions and simple decisions.[10] This is consistent with the ALJ's determination and substantive evidence in the record that Webb was moderately restricted in her activities of daily living, had moderate difficulties in maintaining social functioning, had moderate deficiencies in concentration, persistence, or pace, was limited to jobs with a RDL of one, two, or three, and must have no more than superficial contact with the public. Moreover, even if such inconsistency exists, it does not render the ALJS' determination unsupported by substantial evidence.

    3.  Vocational Testimony

Webb also argues that the ALJ erred in failing to obtain vocational testimony regarding whether Webb's moderate limitations in concentration, persistence, and pace would interfere with her ability to perform her past relevant work as a city bus driver. (Pl.'s Br. at 16-17; Pl.'s Reply Br. at 5-6.) Webb contends the vocational expert testimony, which was relied on by the

---

[10] A job as a city bus driver that requires a RDL of three is not necessarily inconsistent with an RFC that includes only the ability to perform simple, routine work tasks. *See, e.g., Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 613-14 (E.D. Tex. 2009); *Gaspard v. Soc. Sec. Admin. Comm'r*, 609 F. Supp. 2d 607, 617 (E.D. Tex. 2009); *Pete v. Astrue*, No. 08-CV-774, 2009 WL 3648453, at *5-6 (W.D. La. Nov. 3, 2009); *Dugas v. Astrue*, No. 1:07-CV-605, 2009 WL 1780121, at *6 (E.D. Tex. June 22, 2009) ("A limitation of performing 1-2 step instructions in a simple, routine work environment does not necessarily preclude the ability to perform jobs with reasoning levels of 2 or 3.") (internal citations omitted); *Adams v. Astrue*, No. 07-CV-1248, 2008 WL 2812835, at *3 (W.D. La. June 30, 2008) ("As several courts have held, reasoning level two requires the worker to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations, and appears consistent with residual functional capacity to perform simple, routine work tasks."). In addition, "the use of the word 'detailed' in the DOT is not equivalent to the word 'detailed' as used in the Social Security regulations." *Adams*, 2008 WL 2812835, at *3; *see Abshire v. Astrue*, No. 07-CV-1856, 2008 WL 5071891 (W.D. La. Oct. 29, 2008) (stating that the Social Security Regulations have only two categories of abilities as to understanding and remembering instructions while the DOT has six levels for measuring this ability).

ALJ in his decision, was based upon a defective hypothetical question that failed to incorporate all of her limitations because it did not include any reference to her moderate limitations in concentration, persistence, and pace caused by her affective disorder.  (*Id.*)

A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (citing *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Id.*   The ALJ is not required to incorporate limitations into the hypothetical questions presented to the VE that he did not find to be supported in the record.  *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).  The hypothetical presented to the vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ's residual functional capacity assessment, and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  If the ALJ's hypothetical fails to incorporate all such functional limitations, the ALJ's determination is not supported by substantial evidence.  *Id.*  A claimant's failure to point out problems in a defective hypothetical does not salvage that hypothetical as a proper basis for a disability determination.  *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

The ALJ stated in his decision that Webb's mental impairments, among other things, resulted in moderate deficiencies of concentration, persistence, and pace.  (Tr. 21.)   In his hypothetical question to the vocational expert at the hearing, the ALJ failed to specifically include such limitation and stated to the VE that Webb could perform the full range of work except that she must perform jobs with a RDL of one, two, or three and must have no more than

superficial contact with the public.  (Tr. 22.)[11]

The issue is whether a hypothetical posed by the ALJ that limits the claimant to performing jobs with a RDL of one, two, or three incorporates a limitation of having moderate deficiencies in concentration, persistence, or pace.[12]  The category of concentration, persistence, or pace refers to the ability to sustain focused attention and concentration to permit the timely and appropriate completion of tasks commonly found in work settings.  20 C.F.R. Pt. 404, Subpt. P. App. 1 § 12.00C(3).

As to the specific facts in this case, including that Webb's past relevant work was that as a bus driver, the court concludes that the ALJ's hypothetical failed to properly incorporate a limitation of having moderate difficulties in concentration, persistence, or pace.  A bus driver is defined as a semiskilled job and is described under the DOT as driving a "bus to transport passengers over specified routes to local or distant points according to time schedule."  DOT § 913.463-010.  The skill level and job description of a bus driver does appear to require

---

[11] The defendant argues that Webb's argument is not valid because the Fifth Circuit Court of Appeals has found, in an unpublished opinion, that mild difficulties in daily living and in maintaining social functioning, combined with moderate deficiencies of concentration, persistence, or pace are not incompatible with the performance of jobs requiring a RDL of three.  (Def.'s Br. at 5.)  *See Gutierrez v. Barnhart*, 2005 WL 1994289, at *9 (5th Cir. 2005); *see also Seay v. Astrue*, 2008 WL 4861980, at *9 (W.D. La. Oct. 17, 2008).  However, the court in *Gutierrez* was not reviewing the ALJ decision in terms of a faulty hypothetical to the VE.  In *Gutierrez*, the claimant, *inter alia*, challenged the ALJ's conclusion that she could perform jobs with a RDL of one, two, or three based on the ALJ's findings that she was mildly restricted in her activities of daily living, had mild difficulty maintaining social functioning, and experienced moderate deficiencies in concentration, persistence, or pace. *Id.* at *8.  The court, in analyzing this issue in *Gutierrez*, focused on the following: (1) the relationship between 20 C.F.R. §§ 416.920a and 416.921, (2) failure of the ALJ to rely on a particular doctor's medical opinion, and (3) SSR 96-9p.  The court in *Gutierrez* ultimately upheld the ALJ's above conclusion "because the ALJ properly applied §§ 416.920a(c)(3) and 416.921 and because the determination was based on substantial evidence considering Dr. Finn's opinion and Gutierrez's work experience."  *Id.* at 10.

[12] Webb concedes that the ALJ's finding that Webb was limited to jobs only requiring incidental public contact properly incorporates the ALJ's limitations with regard to Webb's moderate difficulties in maintaining social functioning.  (Pl.'s Br. at 16.)  *See Ramsey v. U.S. Comm'r Soc. Sec. Admin.*, No. 06-1986, 2008 WL 341698, at *1 (W.D. La. Feb. 7, 2008) ("The ALJ adequately included limitations regarding social functioning in the requirement that Plaintiff not have contact with the public under circumstances generating high levels of stress.").

24

significant amounts of concentration, persistence, and pace as the driver is required to transport passengers within a time schedule.  Pl.'s Reply 5.)  Thus, it is not apparent that the ALJ's hypothetical to the VE limiting Webb to job's with a RDL of one, two, or three properly incorporates such limitation.  *Cf. Ramsey*, 2008 WL 341698, at *1 (holding that any failure of the ALJ to include the claimant's functional limitation of having moderate difficulty in maintaining concentration, persistence and pace in the hypothetical question posed to the VE was harmless because the jobs identified by the VE were "unskilled and ha[d] no apparent requirement for concentration, persistence or pace of any significant degree."); *Adams*, 2008 WL 2812835, at *4 ("A limitation to simple, repetitive, routine tasks adequately captures deficiencies in concentration, persistence, or pace.).  Because the ALJ's hypothetical failed to incorporate all Webb's functional limitations, the ALJ's determination that Webb can perform her past relevant work as a bus driver based upon the testimony of the VE is not supported by substantial evidence.  Thus, the case must be remanded on this issue.

<u>RECOMMENDATION</u>

It is recommended that the Commissioner's decision as to the issue of posing a proper hypothetical question to the VE that properly incorporates all of the disabilities of the claimant recognized by the ALJ, including the effect Webb's moderate deficiencies in concentration, persistence, and pace would have on her ability to perform her past relevant work as a bus driver, be reversed and remanded for further administrative proceedings consistent with these proposed findings and conclusions.  The Commissioner's decision should otherwise be affirmed.

NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
 AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document.  The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until March 23, 2010.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made.  *See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until March 23, 2010 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to

26

the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby

is returned to the docket of the United States District Judge.

SIGNED MARCH 2, 2010.


_____/s/   Charles Bleil_____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE